PETE EDWARDS, Respondent, v. REESE LEE et al., Appellants.

St. Louis Court of Appeals, February 21, 1910.

1. **COMMON CARRIERS: Carriage of Live Stock: Delivery of Other Stock.** In an action against a carrier for damages for delivering inferior cattle to plaintiff's consignee, in place of those shipped by plaintiff, evidence *held* to sustain a finding that some of the cattle delivered to the consignee as plaintiff's were not shipped by him.

2. ——: ——: **Delivery to Agent Sufficient.** Cattle shipped were delivered to the consignee, when they were receipted for and taken charge of by its agent, and the carrier would not thereafter be responsible for them.

3. **INSTRUCTIONS: Abstract Propositions of Law Should not be Submitted.** An instruction merely stating an abstract proposition of law, though stating it correctly, should not be given, as it affords the jury no aid.

4. **COMMON CARRIERS: Carriage of Live Stock: Proper Delivery Prevented by Act of God or Public Enemy: Instruction: Harmless Error.** In an action against a carrier for damages by breach of the contract of shipment, an instruction that if defendant failed to deliver the cattle to the shipper's consignee in good condition, being prevented only by the act of God or the public enemy, and plaintiff sustained damage by reason of such failure, the carrier was liable, was erroneous, as making it liable, though prevented from delivering the cattle by the act of God or the public enemy; but the error of such an instruction was harmless, where defendant claimed the cattle were, in fact, delivered, and did not defend on the ground they had been lost through such causes.

5. ——: ——: **Delivery of Other Stock: Measure of Damages: Instructions.** In an action against a carrier for damages for delivering inferior cattle to plaintiff's consignee in place of those shipped by plaintiff, it was error to instruct that the jury in assessing damages should take into consideration the difference in the quality of plaintiff's cattle and those he received pay for, according to their market value at the place of destination, and the difference between the weight of the cattle delivered and those shipped by plaintiff, there being no testimony the cattle shipped weighed more than those delivered, and the difference in the quality of the two lots not being a proper element to consider in ascertaining the damages, the proper measure of damages being the difference between the market value of the cattle shipped and those delivered

6. ——: ——: ——: ——: **Burden of Proof.** In an action against a carrier for damages by delivering inferior cattle belonging to another to plaintiff's consignee, in place of those shipped by him, the burden is on plaintiff to show the market value of the cattle shipped and those delivered as his, so as to enable the jury to determine the difference in assessing damages.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED AND REMANDED.

*Faris & Oliver* for appellants.

(1)   The court erred in refusing to instruct the jury at the close of all the evidence, that under the law and the evidence in this case, their verdict and finding should be for the defendants. Roberts v. Railroad, 56 Mo. App. 60; Peck v. Railroad, 31 Mo. App. 123; Mexico v. Jones, 27 Mo. App. 534; Reichenbach v. Ellerbe, 115 Mo. 588; Jackson v. Hardin, 83 Mo. 175.   (2)   Instruction number 3 is erroneous and hurtful to the defendants for many reasons, even if it was possible for the jury to understand its substance and intended meaning:   (a)   First, the instruction is erroneous because it refers the jury to the pleadings to determine the point of destination of the shipment in question, and also as to the measure of damages.   The jury was not advised in this instruction, nor in any other, where the shipment of cattle was to be delivered.   The jury was also told that the measure of plaintiff's damages was such as the proof warranted "not exceeding the amount sued for."   Shaw v. Dairy Co., 56 Mo. App. 521; Clark v. Loan Co., 46 Mo. App. 248; Fleichmann v. Miller, 38 Mo. App. 177; Commission Co. v. Hunter, 91 Mo. App. 333.   (b)   By this instruction, as worded and punctuated, the jury was told or was attempted to be told, that in arriving at the amount of plaintiff's damages, they should take into consideration, should you find (for plaintiff) that plaintiff's damages resulted from a failure of defendants to deliver plaintiff's said cattle, so transported, to plaintiff's consignee, and that plaintiff's said cattle, by reason of said failure were delivered to other and different parties than plaintiff's consignee, and that plaintiff received pay for other and inferior cattle (then) you should take in consideration, the difference

in the quality of plaintiff's cattle, and those he received pay for." Stanley v. Union Depot Co., 114 Mo. 620; Young v. Ridenbaugh, 67 Mo. 574; Legg v. Johnson, 23 Mo. App. 590. (c) This instruction was erroneous for the further reason that it attempted to tell the jury that the measure of damages was the difference in the market value of plaintiff's cattle and other cattle for which he received pay for in the city of St. Louis, when as a matter of fact and from all the record no competent evidence was offered showing what the market value of the cattle in question or "other cattle for which plaintiff received pay for" was, in St. Louis.

*W. W. Corbett* and *Duncan & Bragg* for respondent.

GOODE, J.—Case for damages against defendants as common carriers. Defendants operate a steamboat line on the Mississippi river; they keep boats, among them the Stacker Lee, plying between the ports to the south of St. Louis and this city, carrying freight and passengers. Petition alleges plaintiff, on January 23, 1907, delivered to the captain of the Stacker Lee, on board the boat at Richard's Landing, eleven head of steers, which were fat and had been corn-fed during the fall and winter and were of the value of $250; the captain of said boat representing defendants agreed safely to transport said cattle and deliver them to Smith Bros. & Sparks, at St. Louis, Missouri, giving plaintiff at the time a bill of lading which is attached to the petition as part of it; defendants, through said captain and other agents and employees on the steamboat, committed breaches of the contract of shipment, in this: They failed to deliver the cattle according to the contract and said captain and employees permitted the cattle to be delivered to other persons than those to whom they were consigned; allowed plaintiff's cattle to become mixed with other and inferior cattle so his were delivered to

the wrong persons and the inferior cattle delivered to
Smith Bros. & Sparks in place of plaintiff's, to his dam-
age in the sum of $250, for which he prayed judgment.
Answer denied the statements of the petition. We have
not found the bill of lading in the transcript, but the evi-
dence shows without conflict plaintiff loaded eleven
steers on the Stacker Lee at Richard's Landing on
January 23, 1907, to be carried to St. Louis and deliv-
ered to the consignees, Smith Bros. & Sparks; the cat-
tle were accepted by defendants for carriage on the same
morning as were ten head of other cattle belonging to
a man named Oakley, which were loaded at the same
landing and just prior to the hour when plaintiff's were
put on. As to where the two lots of cattle were placed
on the boat with reference to each other, there is a
conflict, the testimony for defendants being they were
put on opposite sides of the boat, either when loaded
or shortly after. A witness said one lot was placed on
the starboard and the other on the larboard side;
whereas the testimony for plaintiff was both lots were
put on the same side of the boat and beside each other,
being separated by portable gates which were set up to
keep them apart. These gates were about four feet
high and fastened in some manner to keep them erect,
but whether stanchly enough to do that is in doubt.
Testimony for plaintiff goes to prove his steers were in
fine condition, weighed from 850 to 1000 pounds each
and were worth from $3 to $3.25 a hundredweight; that
Oakley's cattle were all smaller, some of them were
heifers and they were worth considerably less per hun-
dredweight; also Oakley's lot would weigh 3000 or 4000
pounds less than plaintiff's lot. Plaintiff testified he
remonstrated with the officers of the boat about the
condition of the gates between his cattle and Oakley's,
saying the gates would not keep the stock apart and
they would get mixed, but the officers promised they
would prevent this. The boat appears to have reached
St. Louis January 26th, for on that day a receipt was

executed in behalf of Smith Bros. & Sparks, by a man named Bender, who, as the testimony goes to prove, was the agent of Smith Bros. & Sparks to receive at the stockyards all stock consigned to said firm. The receipt said that firm had received from the steamer Stacker Lee, in good order, eleven head of cattle; without saying whose they were, but with a notation which indicates they had been shipped from Richard's Landing. The evidence shows said stockyards were where all stock coming into St. Louis by boat for said firm were unloaded. Plaintiff's cattle were taken in charge at St. Louis by the firm of J. A. McNeily & Sons, in behalf of Smith Bros. & Sparks. The boat arrived in the evening, the cattle were unloaded and after being placed in pens in the Independent stockyards (also called the Union Stockyards) and receipted for by Bender, McNeily & Sons took charge of them under an order they held from Smith Bros. & Sparks, authorizing them (McNeily & Sons) to take charge of all cattle consigned to said firm at the stockyards. The lot of cattle turned over to McNeily & Sons as the property of plaintiff, was afterwards sold and plaintiff realized net from the sale $105. T. E. McNeily, who represented McNeily & Sons in the transaction, testified the cattle were unloaded from the Stacker Lee about 7:30 in the evening, and he took them the next morning; he found in the pen supposed to contain plaintiff's cattle, eight, nine or ten head; the remainder necessary to make out the eleven head were in another pen; he never saw them until they were taken out of the pen and turned over to him; Oakley's cattle, ten head, were sold by another commission company, Blakely, Sanders & Mann; witness saw Oakley's cattle and they were much heavier than plaintiff's; the latter's cattle were all steers except one or two little heifers and one little cow and weighed 6000 pounds; he did not look at the weights of the Oakley cattle, but knew from their appearance they were much heavier than plaintiff's; Oakley's cattle, as

he learned, weighed 8860 pounds. This is the evidence to show the cattle shipped by plaintiff were not delivered to the consignee. For defendants several of its officers, and employees on the boat testified that Oakley's cattle and plaintiff's were loaded on different sides of the boat, were kept apart during the whole trip, were unloaded into separate pens at St. Louis, plaintiff's cattle and the very ones shipped from Richard's Landing were turned over to Bender for Smith Bros. & Sparks and Oakley's cattle were delivered to another consignee. More than three hundred cattle were carried to St. Louis on the boat. The evidence for defendants on the issue of the delivery of the cattle shipped by plaintiff was positive and unequivocal, and they asked the court to direct a verdict for them, but this request was refused. The following instruction, among others, was given to the jury at plaintiff's instance, and complaint is made of it by defendants: .

"The court instructs the jury that if you believe and find from the evidence that on or about the 23d day of January, 1907, the plaintiff contracted with the defendants, through their agents or legal representatives to transport 11 head of cattle, said cattle at the time being in good condition, on the Mississippi river, from Richard's Landing in Pemiscot county, Missouri, to the city of St. Louis, Missouri, which cattle were consigned to Smith Bros. & Sparks, and that said cattle were delivered to the defendants, through their authorized agent, or legal representatives in good condition, and by them placed on board the steamboat Stacker Lee, the said boat being in charge of defendants' agents, servants, and employees, and that defendants failed to deliver said cattle to the plaintiff's consignees in good condition, as per their said contract, being prevented only by the act of God or the common enemy, and that by reason of the failure of the defendants so to deliver said cattle, you find and believe from the evidence the plaintiff has sustained damage, you will find

for the plaintiff in such sum as the proof shows he has been damaged, not greater than the amount sued for; and in estimating the plaintiff's damage you should take into consideration, should you find that plaintiff's damage resulted from a failure of defendants to deliver plaintiff's said cattle so transported, to plaintiff's consignee, and that plaintiff's said cattle, by reason of said failure were delivered to other and different parties than plaintiff's consignee, and that plaintiff received pay for other and inferior cattle, you should take in consideration the difference in the quality of plaintiff's cattle and those he received pay for, according to their market value, in the city of St. Louis, and the difference in the weight of the cattle."

These instructions were given at defendants' instance:

"The court instructs you that upon the plaintiff rests the burden of proof and unless you believe and find from the evidence that the plaintiff has proven the issue of facts and the allegations of his petition by the greater weight or the preponderance of the testimony over the testimony of the defendants, your verdict will be for the defendants.

"The court instructs you that before you find for the plaintiff in any sum whatever, you must believe and find from the evidence that after plaintiff's cattle were delivered to the steamboat Stacker Lee, and before they were delivered by the master, servants or employees of said steamboat to the clerks, servants or employees of the Union Stockyards in the city of St. Louis, Missouri, said cattle of plaintiff were mixed up with or exchanged for other cattle of inferior grade, thereby causing plaintiff's lot or shipment of cattle to depreciate in value; and in this connection you are further instructed that if you believe and find that said Union Stockyards were, in January, 1907, and prior thereto, the usual and customary place for defendants' steamboats to deliver all shipments of live stock to the various

live stock buyers and commission merchants of live stock in the city of St. Louis, then the delivery of plaintiff's cattle to the stockyards was in law a delivery to plaintiff's consignee, Smith Bros. & Sparks, and your verdict and finding should be for the defendants.

"The court instructs you that if you believe and find from the evidence that the cattle of the plaintiff were kept separately penned up while in the custody of the defendants' servants, agents and employees, and without being mixed up or intermingled with other cattle, and were delivered to the clerk, servants or employees of the Union Stockyards in the city of St. Louis, Missouri, and that said Union Stockyards were, in January, 1907, and prior thereto, the usual and customary place used by the defendants' steamboats for discharging and unloading all of its shipments of live stock, then such delivery of plaintiff's cattle was in law a delivery to the consignee of said shipment, Smith Bros. & Sparks, and your verdict and finding should be for the defendants."

It is contended for defendant the evidence failed to show any of plaintiff's cattle were not delivered to the consignee at St. Louis, but we think otherwise. The testimony yields the impression that some of the cattle turned over to the consignees were never shipped by plaintiff, and would uphold that conclusion; for his were all steers and McNeily testified there were two or three cows among the lot delivered to him as plaintiff's. The evidence for plaintiff was directed to prove Oakley's cattle were substituted for his, but there was no direct proof this occurred, and if any animal which was not plaintiff's was delivered as his, it may have been some of the other cattle on the boat. This is immaterial, the questions being whether plaintiff's cattle were delivered, and if not, how many of them were omitted from delivery and the loss to him. His counsel insist defendants were responsible for the cattle in the stockyards and until they were turned over to McNeily

for Smith Bros. & Sparks, the morning after their arrival. They were receipted for, as we have seen, by Bender, who represented the consignees at the stockyards, and taken charge of by him, and thereafter defendants were not responsible, for this was delivery to the consignees.

We have omitted to copy the first two instructions granted for plaintiff because they stated abstract propositions of law, and though probably correct, should not have been given, as they afforded the jury no aid. The third instruction, which is copied, supra, is unsound and confusing. For one thing it was so drawn as to make defendants responsible even though they were prevented from delivering the stock by the act of God or the public enemy, which is a good excuse for the failure of a carrier to deliver goods as per the bill of lading, and no doubt was intended to advise the jury as to the exception to defendants' liability; but as the instruction reads, they were made liable even if they failed to deliver them from one of those causes. This would be harmless error because defendants did not resist recovery on the theory the cattle had been lost from one of said causes, but contended they were delivered to the consignees. The instruction is otherwise inaccurate and misleading. It propounded no proper measure of damages, in case plaintiff was found entitled to recover. The jury were told to take into consideration in ascertaining the amount of damages sustained, the difference in the quality of plaintiff's cattle and those he received pay for according to their market value in the city of St. Louis, and the difference in the weight of the cattle. No evidence was introduced to show what plaintiff's cattle weighed. McNeily testified the lot turned over to him as plaintiff's weighed six thousand pounds, but as plaintiff was disputing those were his cattle, that testimony only went to prove the cattle received by McNeily were not plaintiff's because they weighed less than Oakley's, and the former's

cattle were shown to have been heavier than Oakley's. In the absence of some testimony that plaintiff's cattle weighed more than the lot delivered as his, the jury could not find they did and allow damages based on the difference in weight. Neither was the difference in the quality of the two lots to be considered in ascertaining the damages, but the difference between their market values. Expert witnesses testified plaintiff's cattle were worth $3 to $3.25 a hundredweight, and no doubt it can be proved what the cattle sold as plaintiff's brought per hundredweight. If it should be found other cattle were substituted for plaintiff's, then the measure of damages will be the difference per hundred or per head at destination in the value of the cattle shipped by plaintiff and those delivered as his, and plaintiff must produce evidence to enable a jury to find what this is.

The judgment is reversed and the cause remanded. All concur.